in favor of the plaintiff. Undoubtedly the defendant, while repairing its road in the manner indicated, was justified in requiring its passengers to alight at the place of the accident; but it was bound to see that the displaced rails were placed in such a manner as not to endanger the safety of its former passengers. This question was fairly submitted to the jury. Nor does it matter that the street to the north of the track was free and unencumbered. The plaintiff had the right to go to the south side of the street, which was on her route to the ferry. Whether or not she was negligent in attempting to cross the rails was a question for the jury, and that fact has been found in her favor.

We are thus brought to the questions of law involved. The defendant moved to dismiss the complaint on the ground that the plaintiff had ceased to be a passenger of the defendant. This was denied, but the court charged that when the plaintiff alighted from the car the duty of the defendant, so far as the relation of carrying was concerned, had ended, but that the plaintiff was entitled to reach her destination at the ferry under such conditions and surroundings and circumstances as would not place her in undue peril. It remains to notice one refusal to charge:

"I ask you to charge that the plaintiff saw the rails, and, after looking at them, decided that they were safe for her to step upon; and for her error of judgment defendant is not liable."

This request assumed that the plaintiff saw, or could see, that the rails were so firmly laid that there was no danger in stepping upon them. She was only obliged to exercise reasonable judgment and care in this respect, and she is not chargeable with absolute knowledge whether or not it was perfectly safe for her to attempt to cross. The court did charge that if, by the "exercise of reasonable care plaintiff could have seen the danger, and ought to have apprehended the danger, of the situation, she was chargeable with negligence, for she was not at liberty to take even doubtful chances of the consequences of crossing these rails."

We see no reason for which the judgment should be reversed. All concur, except HATCH, J., dissenting.

---

WENDLER v. EQUITABLE LIFE ASSUR. SOC. OF THE UNITED STATES.

(Supreme Court, Appellate Division, First Department. June 11, 1897.)

MASTER AND SERVANT—PROOF OF RELATION.

    Defendant employed one F. to paint its building. F. sent plaintiff, who was one of his (F.'s) employés, to do the work, telling him to take his orders from the superintendent of the building. Plaintiff found a man in the building who said that he was the superintendent, and who took plaintiff through the building. The superintendent showed plaintiff how to get on the roof, and told him that he could go through the windows to get at his work, but that he must have only one window open at a time to avoid danger of fire. Plaintiff then asked the superintendent how to fasten his scaffold, and was told that he ought to know how to do that. The superintendent gave plaintiff no instructions as to how the painting should be done. *Held*, that there

was no such assumption of control by the superintendent over plaintiff as would make him a servant of defendant, and thereby render defendant liable to plaintiff, on the theory that he was not furnished with a safe place to work.

Appeal from trial term, New York county.

Action by Christopher Wendler against the Equitable Life Assurance Society of the United States for personal injuries. The complaint was dismissed, and plaintiff appeals. Affirmed.

Argued before VAN BRUNT, P. J., and RUMSEY, WILLIAMS, O'BRIEN, and INGRAHAM, JJ.

O. G. F. Wahle, for appellant.

C. B. Alexander, for respondent.

VAN BRUNT, P. J.  This action was brought to recover damages sustained by the plaintiff by falling from a window and scaffold, he having been engaged in pursuing his occupation as painter upon a building of the defendant. The defendant was the owner of the premises known as "44 Atlantic Dock," Brooklyn, and at the time of the accident the said building was under its control and charge. The building appears to have been used for the purpose of the storage of cotton, and on the 5th of September, 1892, the plaintiff, who was a painter by trade, and employed by Fisher Bros., painters and decorators, was sent by his "boss" to the building to work, and was directed to receive orders from the superintendent of that building. Upon that day he went to the building, and saw a sign, "Superintendent's Office Upstairs." He then went up one flight of stairs, and saw a door upon which was printed the word "Office." He went in and saw two men in the office; one sitting on one side, and the other on the other side, of a desk. He asked one of the men sitting at the desk whether he was the superintendent. The man answered "Yes." Whereupon the plaintiff told him he had been sent there by Fisher Bros. for painting. The man then took some keys, and went with the plaintiff, and opened the door of the storage house, after which he left the keys in the charge of the plaintiff. The plaintiff thereupon went upstairs with him, and asked him how to get on the roof. The man said: "Come with me, and I will show you." He then took the plaintiff as far as the top floor of the building. He said: "Wait one moment. It is dark, and I will have to open one of these shutters." He opened one, and the plaintiff and he got on the roof. The plaintiff then asked him about fastening the scaffold, and he said: "You ought to know, if you are a painter." The plaintiff replied: "I will tie a rope around the beam, and fasten it around." And the man said: "That will do." The plaintiff then asked him how about getting in and out of these windows, and he said: "Go over the bales of cotton, and get to the windows. Grab hold of the iron bar to get over the bales of cotton. Other men do that, and you must do it." The man instructed him that he must only leave one window open at a time; that if he left the windows open, and any sparks got in there on the cotton, and set it on fire, the plaintiff would be held responsible. In front of the windows

were iron bars, about $2\frac{1}{3}$ feet above the bottom of the window, and the bales of cotton came up about $4\frac{1}{2}$ feet from the bottom of the floor. The windows were inclosed in glass and iron shutters. The iron bars were fastened on each side of the window casings with screws. The plaintiff further testified that, in his conversation, he asked the man who accompanied him, "Is that strong enough?" and the man answered, "If you want to pull that iron bar down, you will have to pull down the side of the house; that is strong enough for an ox." It further appeared that on the 7th of September the plaintiff went to work as usual, and in the afternoon of that day he was working on the second storage house, on the third story from the ground. Mr. Fisher, his employer, came and called him off the scaffold. After Mr. Fisher called him, he placed his foot onto the sill of the window, and his hands on the iron bar, with the intention of going in. He tried to bend his knee to get underneath the bar, still holding the bar in his hand, when out came the bar, and backward the plaintiff fell. He had both legs on the sill, and he drew on the falls, but not on the bar, to help himself in. As he fell with the bar, he struck the scaffold, pushing it from the building, and fell to the ground. For the damages sustained by this fall this action was brought. Upon the trial, after the termination of the plaintiff's case, the complaint was dismissed.

The question which it is necessary to consider here is, did the relation of employer and employé at all exist between the plaintiff and the defendant? It was sought to establish this relation by the transaction which took place between the plaintiff and the alleged superintendent, who, it is alleged, gave directions to the plaintiff with reference to the conduct of the work. It appears, from the evidence, that the plaintiff was in the employ of Fisher Bros., and that they were doing the work, but under what kind of a contract does not appear. It is sought, however, by proof in reference to what transpired between the plaintiff and the alleged superintendent, to establish the relationship of employer and employé by reason of the directions given by the latter. The plaintiff, in order to establish the fact that this alleged superintendent was the alter ego of the defendant in reference to the management of the building in question, testified, in addition to what has been already stated, that he saw the alleged superintendent instructing other men what to do, weighing cotton, and giving them orders to put it on the lighters, and that he had the keys of the warehouse. One of the plaintiff's witnesses also testified to the same effect in regard to what he had seen this alleged superintendent do. Upon a consideration of the whole of this evidence, however, it does not by any means establish that this person, who had charge of the warehouse in question, and who was evidently managing the cotton storage business which was carried on by the defendant upon its premises, had anything to do with the management or employment of the men who were at work painting the building. It appears that Fisher Bros. were the "bosses" of the job, that the plaintiff was employed by them, and that the only direction which the alleged superintendent gave in respect to

this work was a direction looking to the security of the building during the progress of the work. The plaintiff was not directed as to how he was to do the work, except that he should not imperil the building by leaving the windows open; and he was told that he might go in and out of the windows for the purpose of getting upon the scaffold. This by no means constituted such an assumption of control over the servants of Fisher Bros. as would make the defendant responsible, even if this alleged superintendent had the authority so to do. In all the directions which he gave he was only taking such precautions as were necessary to protect the property of his principal while this work was being prosecuted. We think the evidence wholly failed to show any assumption or direction of the work, or charge of the work, such as would make the plaintiff in any respect the employé of the defendant. Neither does the evidence show that the alleged superintendent had any authority whatever to control the work, or to give any directions in respect thereto by which he might bind the defendant. All that the evidence tended to show was that he had something to do with the business there carried on, and that he weighed and attended to the delivery of the cotton. It is true that the plaintiff swears that he said he was the superintendent. But an agency can never be proven by the declarations of the agent himself. Upon consideration of all the evidence, it seems to me that it cannot be held that anything was shown which would make this alleged superintendent the alter ego of the defendant, so that it became responsible for any declaration which he might make, and especially if such declarations are to amount to a warranty in respect to the condition of any part of the building.

The learned court below seems to have put his decision upon a different ground, namely, that no act of negligence was shown upon the part of the defendant, that the iron bars in question were apparently safe, and that there was no evidence that an inspection would have disclosed the fact that the wood was rotten underneath the bar, or that there was any defect in the fastening. This may be another consideration which would tend to support the judgment. The bar was similar to others which had been used in the manner in which the plaintiff was using this bar. There was nothing to distinguish it. It was apparently sound. Inspection would not have disclosed any defect; and, as a consequence, it is difficult to see upon what negligence on the part of the defendant could be predicated.

Upon the whole case we are of opinion that the judgment appealed from should be affirmed, with costs. All concur.