LARSEN *v.* HOME TELEPHONE CO.

1. NEGLIGENCE—RAILROADS—ADJACENT PROPERTY.

In an action by a widow for the negligent killing of her husband, a conductor of a freight train, which ran into a telephone pole as it rolled from a pile near the track, the question of the negligence of the defendant telephone company was for the jury, under evidence tending to show that the poles were carelessly piled, by allowing them to roll from a car, and that no effort was afterwards made to straighten them or put them in order.

2. SAME.

And the claim that an iron bar, placed by deceased on the footboard of the engine on which he was riding, struck and caused the pole to start, raised a question of fact, upon conflicting evidence.

3. SAME—CONTRIBUTORY NEGLIGENCE—JURY TRIAL.

The question of deceased's contributory negligence was for the jury.

4. SAME—CONSTRUCTION CONTRACT—TELEPHONE COMPANIES — INDEPENDENT CONTRACTOR—CONTRACTS.

The defendants contracted for the construction of a telephone system in Detroit, one of them acting as construction company, and promoting the entire enterprise, the other to pay for and accept the completed plant and equipment. The character of work and kind of tools and appliances to enter into the system were, under the contract, subject to the approval of the telephone company's engineer, who also had authority to make any change in the extent, dimensions, plans, or character of the work and materials, to reject or approve subcontracts, and to determine the location of buildings, materials, and apparatus. The tools and appliances used by the construction company were to belong to the telephone company at the completion of its contract. All work was to be performed, and materials and apparatus to be placed as the engineer should direct. *Held*, that the negligence of the construction company in piling telephone poles near the railway track, insecurely, was not the negligence of an independent contractor but of the telephone company. HOOKER, J., dissenting.

5. TRIAL—SPECIAL QUESTIONS—NEGLIGENCE.

It was not error to add to a special question submitted to the jury as to whether or not the death of plaintiff's intestate was caused by the rolling of a pole from the pile in question, the additional phrase "which pile had been negligently piled," where the question was answered "yes;" and the original question was necessarily answered in the affirmative by the finding of the jury.

6. DEPOSITION—ADMISSIBILITY—DIFFERENT ACTION.

The deposition of a witness taken in a separate action, brought by different counsel, in which one of the defendants was not a party, was properly excluded as incompetent.

7. TRIAL—DAMAGES—EXPECTANCY OF LIFE—CROSS-EXAMINATION.

After defendants had offered evidence tending to show that plaintiff's health was impaired, it was proper to permit her physician, as bearing on the expectancy of her life, to testify that in his opinion her condition would not be likely to shorten her life much.

8. SAME—DAMAGES—INTEREST.

Under instructions requiring the jury to compute plaintiff's damage as of the date of her husband's death, interest was properly added to the date of trial.

Error to Wayne; Murfin, J. Submitted April 21, 1910. (Docket No. 155.) Decided February 1, 1911.

Case by Selma Larsen, administratrix of the estate of Simon Larsen, deceased, against the Home Telephone Company of Detroit and the Electric Construction Company, a foreign corporation, for the negligent killing of deceased. Judgment for plaintiff. Defendants bring error. Affirmed.

*Thomas A. E. Weadock*, for appellants.

*Hunt & Altland*, for appellee.

HOOKER, J. Defendants have appealed from an adverse judgment.

The principal questions in this case can be made plain by an outline of the facts without including the details necessary to be understood when the various assignments of error are discussed, and which can more conveniently be stated in connection with the respective points relied on. The plaintiff's intestate was a railroad conductor in charge of a freight train on the Grand Trunk road. While riding on the footboard of the engine in the railroad yard in Detroit, he was thrown, or fell, or stepped, from the footboard, and was run over, dying from the injury about 40 minutes later. The widow, his administratrix, sued two defendants, claiming negligence on their part in piling a lot of telephone poles, which are said to have rolled down in front of, or against, the engine, thus causing the accident. It will be noticed that there are but the two defendants—one the Home Telephone Company, which was admittedly a Michigan corporation, and which was taking steps to have erected a telephone system, the other a Missouri corporation, engaged in furnishing the

materials, and erecting the plant, under a contract with the Home Telephone Company. Upon the trial the important questions were:

(1) Was the accident caused by negligence in piling the poles?
(2) Was deceased chargeable with contributory negligence?
(3) Was the Home Telephone Company in any way legally responsible to the plaintiff for the negligent piling.
(4) Questions affecting the Construction Company.

1. **Negligence a Question of Fact.** There was testimony that the poles were unloaded from a car by the employés of the Electric Construction Company by merely cutting the wires which bound or held them upon the car after removing the stakes, and that many rolled off from the car, others being thrown off, and that no care was taken to lay them straight, and that one rolled down in front of the engine, and was struck by it. The defendant disputed this, and contended that the accident was caused by a piece of railroad iron lying on the footboard, placed there by the plaintiff's intestate, and that this projected far enough beyond the track to strike and throw down the pole. We are of the opinion that it was proper to submit this question to the jury, as it cannot be said that the uncontradicted testimony showed that the presence of the rail caused the accident. Barry, who was on the footboard at the time, testified that he saw the pole come down, and that it was not caused by the rail striking it.

2. **Contributory Negligence.** It follows that the question of contributory negligence was for the jury; for, even if we could say that the loading of the rail was a negligent act, it does not conclusively appear that it dislodged the pole, or was in any way the cause of the accident.

3. **The Home Telephone Company.** Counsel urges, on behalf of the Telephone Company, that the court erred in not directing a verdict in its favor. He contends that the act complained of—i. e., the piling of the poles—was the

act of an independent contractor in the performance of its contract, and that the Home Telephone Company was not responsible for it.    Whether the Home Telephone Company should be held liable for the act of the men who unloaded the car involves two questions:    (a) Was the Electric Construction Company an independent contractor? (b) If so, Did the Home Telephone Company participate in the negligent act?

(a) Was the Electric Construction Company an Independent Contractor?    Ordinarily such a question is to be determined by the contract, and where it depends solely on the contract, and the contract is in writing, it is a question to be determined by the court.    11 Cur. Law, p. 1897; 16 Am. & Eng. Enc. Law (2d Ed.), p. 191.    In *Good* v. *Johnson*, 38 Colo. 440 (88 Pac. 439, 8 L. R. A. [N. S.] 896), it was held error to submit a question to the jury when the contract was in writing.    The case is valuable on the main question in this case, citing and intelligently reviewing many cases which we have not cited.    See, also, *Larson* v. *Bridge Co.*, 40 Wash. 224 (82 Pac. 294, 111 Am. St. Rep. 904).    In *Green* v. *Soule*, 145 Cal. 96 (78 Pac. 337), it was held:

"Where the undisputed evidence showed that the plasterer was an independent contractor as to the building contractor defendant, and the subcontract did not require him to place his materials in any dangerous position, the meaning and effect of the contract and the relations of the parties to it were a question of law for the court; and it is error to refuse requested instructions that the subcontractor was an independent contractor as to the defendant, and that, if the jury believed the injury complained of was the result of negligence on the part of the subcontractor they must find for the defendant."

The court also held:

"The fact that the work was to be done under the supervision of an architect, and that the employer had the right to make alterations, deviations, and omissions from the contract, does not change the relation of an independent contractor or subcontractor to that of a mere servant."

This contract is in writing.

(1) The preamble (if it may be so called) to the contract states that the Construction Company has agreed to undertake the construction of a telephone plant and system contemplated by the Telephone Company, and its equipment, and to assume all risks connected therewith.

(2) In consideration of mutual promises it made its agreement.

(3) It undertook at its own cost and expense to provide all necessary labor and material, and to erect, construct, and complete an extensive telephone plant and system, and, when completed, to deliver and transfer it to the Telephone Company, for which it was to receive $3,250,000 in bonds in the manner provided in the writing.

(4) This plant and system were outlined in plans and specifications already prepared and identified, and such other plans and specifications as should thereafter, in the judgment of the consulting engineer, be necessary or proper, which were to be made a part of the contract.

(5) Said promise included the installation of 10,000 telephones and the procurement of not less than 7,500 bona fide subscribers' contracts for, a year, the Construction Company being authorized to take such contracts in the name of the Telephone Company.

(6) It promised, further, to procure all necessary real estate and transfer the legal title to the Telephone Company, and all necessary street permits and rights of way.

(7) It agreed to use its best endeavor to secure and transfer to the Telephone Company the property, franchises, and rights belonging to the Co-Operative Telephone Company and its stock

(8) It agreed to employ a chief engineer, who should be selected by it, and who should be under its sole control, who should have authority to act for and on its behalf, and said Construction Company might remove or discharge him and select others as occasion might require.

(9) It agreed to protect the Home Telephone Company against infringements of patent by its selection of tools,

appliances, etc., furnished by it to the Telephone Company, and to give bonds to a trustee to secure it in this and other provisions of the contract.

(10) With a view to facilitating the immediate and proper management of the plant upon completion, the Construction Company undertook at its own expense to obtain and train a sufficient number of operators, linemen, and other necessary workmen and employés, and engage them for the use of the Telephone Company after the termination of the contract.

(11) A penalty of $150 a day for the failure of prompt completion and delivery of the plant is provided by the contract.

Counsel for plaintiff contend that there is testimony tending to show, and that the jury should have been permitted to find, as they possibly may have found, that the contract was a sham and the Construction Company a fictitious entity, practically the Home Telephone Company, the Construction Company being a mere tool of the Telephone Company, and therefore not an independent contractor. In support of this claim they urge a similarity in the personnel of the officers of the two companies and many provisions of the contract of an alleged tendency to show the reservation of control of the Construction Company and its employés by the Telephone Company.

The case most strongly relied on in support of this proposition is that of *Holbrook Corporation* v. *Perkins,* 147 Fed. 166, 77 C. C. A. 462. The Holbrook copartnership was sued by a brakeman of the Boston & Maine Railroad for an injury, having been swept from the top of a moving car by a guy rope attached to a derrick. Holbrook defended on the ground that the Atlantic Construction Company alone was liable as an independent contractor. An alleged contract was introduced in support of this claim. The court allowed the jury to find that the Holbrook Company organized the Atlantic Construction Company, a corporation of doubtful validity, inasmuch as it had no capital, and consisting of the

members of the copartnership and its agents, and that a written contract entered into with it for the construction of certain work was not a bona fide contract, but was a mere piece of circumvention, devised to avoid legal liability for accidents and attachment of property in tort actions. The testimony was clear and explicit as to this, and the jury were instructed that, if there was no bona fide contract, there could be no immunity for the Holbrook Company. This doctrine seems well supported, and counsel might well have cited the later case of *Exploration, etc., Co.* v. *Steel Co.*, 177 Fed. 829, 101 C. C. A. 39 *et seq.*, and with this rule we have no fault to find. We might even go the length of saying that the validity of the corporate organization would not conclude the subject of the *bona fides* of the contract, and still say that in this case the question should not have been left to the jury. In the case last cited it was said:

"In *United States* v. *Transit Co.* (C. C.), 142 Fed. 247, 255, it was charged that the transit company was a dummy corporation organized, owned, and operated by the stockholders of the brewing company as a device to cover the receipt of rebates on interstate shipments of beer. After an exhaustive examination of the authorities, the court stated the principle thus:

"'If any general rule can be laid down in the present state of authority, it is that a corporation will be looked upon as a legal entity, as a general rule, and until sufficient reason to the contrary appears; but, when the motion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons.'"

Neither this case nor *United States* v. *Transit Co.* (C. C.), 142 Fed. 247, was a negligence case, but related, to insolvency where rights of creditors were involved. This is unimportant, however. In the present case there is no testimony from which the want of *bona fides* can be inferred, unless it be the statement in the contract that the Telephone Company shall not be liable for damages on account of injuries to third persons. It will not be gainsaid that the Telephone Company had a right to let

its contract to an independent contractor, and that, if it did, the legal effect would be to make the latter only liable for accidents. The *bona fides* of such a contract could not depend on the absence of a motive to avoid such liability; for, in the first place, it is not an unlawful motive, nor an immoral one, and is not a blow to any one's rights, if an actual bona fide contract is made, and for that reason we say that the presence of such a motive, even though it was the sole motive, is as consistent with the *bona fides* of the contract, as with the absence thereof, and we have seen in the cases cited regarding legal entity, the presumption of *bona fides* exists if such motive is all the evidence upon which a different claim is based. In this case, it is shown that two valid corporations existed, and that both had capital and assets, and that they made a contract which on its face is valid. Indeed, they joined with another corporation in a tripartite contract which is inconsistent with any other view than *bona fides* as to the first contract. Even if counsel's contention that these contracts established the fact that the relation of master and servant was created were true, it does not tend to prove that the contract was not bona fide, for the parties were competent to make such contracts as well as others, and we understand that this is not disputed. Moreover, if that were the effect of the contract, it would settle the question of liability, for that alone would be sufficient to establish the application of the rule of *respondeat superior* as to the Telephone Company. There is no testimony in this case that makes a *prima facie* case of lack of *bona fides*, or circumvention.

We come next to the provisions which tend to show that this contract created the relation of master and servant. We have already called attention to some of the many things that show validity and *bona fides* of the contract.

It is said that this writing does not contain a definite description of what the Construction Company must do, inasmuch (*a*) as the plans and specifications were not

complete; (*b*) as the Telephone Company had the right, said to be reserved, to designate where the buildings should be placed; (*c*) as the Telephone Company had the right to add to or change dimensions of buildings, etc.

(*a*) **Plans and Specifications.** We have no doubt that an agreement to erect a telephone plant capable of serving 10,000 subscribers in accordance with the plans to be furnished by the proprietor or his architect, and to the satisfaction of either or both for a specified price, would be a valid contract, and, if this was all there was to it, the relation of master and servant would not be created, and that of independent contractor and employer would be.

(*b*) **The Location.** The fact, if such were the fact, that by the terms of the contract the employer might designate what lot in the city it should be placed upon, and what particular parts of the lot should be used for the several and respective buildings, would not make the contract invalid, and it would make no difference, though the contractor had bound himself to procure and pay for the same. Nor would it change the character of the contractor's relation of independent contractor to that of servant, or that of the other contracting party to master. Parties may make such contracts if they choose.

(*c*) **Changes and Additions.** These are practically covered by what has been said. It may be thought that these are unwise agreements for a contractor to make, but that is for him to settle. It seems to be suggested that the Construction Company may have been so unwise in this case that the concessions contained in the contract are consistent with the relation of master and servant only; yet to indulge such an argument, in view of express provisions, does violence to the language of the contract, and, as it is a question for the court and not for the jury (the *bona fides* being settled), we should say that it would be difficult to find a court who would so hold and it would be error if it did so. We should perhaps add that all of these alleged uncertainties must be looked at in connection with the thing that was under consideration, and the

Home Telephone Company's reserved rights must all be construed with reference to the reasonable necessities of the project. These matters, if uncertain, could be made certain by judicial construction and control if the parties were to disagree.

Control of the Workmen, etc.    This is the really meritorious point on the question of construction. Does this contract reserve to the Home Telephone Company, and therefore take away from the Construction Company, the rights upon which the character of independent contractor depends? In other words, does it show that the latter is a mere representative of the Telephone Company, bound to do its bidding? That it has by its contract agreed to govern its action by the wishes or directions of the Telephone Company in some particulars is not enough, even if it would be were such agreement applicable to all—a question which we need not decide. Even the breach of such promise would not, under this contract, give to the defendant the right summarily to assume control of the work, subcontractors, and employés, but judicial proceedings for damages, or some equitable remedy, would have to be resorted to. Moreover, it is not provisions of that character which justify an inference that the intention of the parties was to make the contractor a mere agency to employ men and buy material for and on the account of the employer, so that, when bought, the material would be its purchase, and, when employed, the laborers would become its workmen subject to its control to the exclusion of the contractor. We must view this whole contract to determine whether the relation of master and servant was the intention of the parties, or was by reason of the terms of the writing actually created. We will refer to some of its provisions which are relied on as requiring us to find that the relation of master and servant is, and that of independent contractorship is not, deducible from this writing.

It is said that the contract gives the Telephone Com-

164 MICH.—20.

pany a general supervision of the work with authority to enforce compliance with the provisions of the contract as the work proceeds, and that it gives a control over the details which is inconsistent with the rights of an independent contractor. The contract provides for a consulting engineer, to be appointed by the Telephone Company (though by the tripartite contract his tenure of office and the selection of his successors is within the control of the bondholders' trustee), who is to approve all material that goes into the buildings or plant before it is used, and the Construction Company agreed to use nothing else. It agreed, also, to carry out all directions, explanations, superintendence, and instructions which the consulting engineer should give in relation to materials or construction, and to the consulting engineer is committed the duty of making the changes in extent and character of the work and plans "necessary or proper" to the plant contracted for, or character of any part of the materials or work contracted for.

We will at this point, and before referring to others, consider these provisions relating to the consulting engineer. We have already seen that the Construction Company has the right and obligation of providing and paying as its own officer a chief engineer who is given the general supervision, direction, and charge of the work and workmen in its employ. The consulting engineer's relation to this job is much like that of a supervising architect. It was certainly competent for the Telephone Company to reserve the right to inspect and approve material and workmanship, and many cases support the proposition that the proprietor does not, by contracting for a right of supervision for the purpose of satisfying himself that the contractor carries out his contract, make himself responsible for the wrongs of the contractor and his employés to third persons—e. g., where a railroad company employs an engineer to superintend the general construction of the road—and to see that the work is done according to the contract, and that is so even though such pre-

liminary approval is not contracted for. That is not equivalent to reserving the right to control the workmen of the contractor who are doing the work, and it would not be, although the contractor should have agreed that he would heed complaints of the engineer, and carry out his suggestions. That is not reserving the right to direct the methods by which the work shall be done, within the meaning of the rule. It is only providing for an opportune interference to see that the contractor does as he has agreed to do in relation to materials, workmanship, and results. The rule is thus stated in substance in 1 Thompson on Negligence, § 660, where many cases are cited:

In *Bayer* v. *Railroad Co.*, 68 Ill. App. 219, it was held that:

"A railroad company was not liable, although it had stipulated with the contractor for the construction of its road and bridges that any foreman or laborer employed by its contractor who shall execute his work in a faulty or unskillful manner, or be disrespectful or riotous in his conduct, shall forthwith be dismissed by the engineer of the railroad company."

In *Wendler* v. *Assurance Society*, 19 App. Div. 50 (45 N. Y. Supp. 866), the court held:

"Where the superintendent of a building used for storing cotton, directs an employé of a contractor engaged to paint the building, to leave only one window open at a time on going through upon a scaffold used by him in painting, because of the danger from fire by the entrance of sparks," the proprietor was not liable.

In *City of Erie* v. *Caulkins*, 85 Pa. St. 247 (27 Am. Rep. 642), it was held:

"That a contract between a municipal corporation and a contractor for the construction of a sewer containing the provision, 'All work to be commenced and carried on at such times and in such places and in such manner as the engineer shall direct,' and requiring the contractor to dismiss from his employment all incompetent and unfaithful persons, did not reduce the contractor to the grade of a servant of the city, and make it answerable for his negligence."

In *Hunt* v. *Railroad Co.*, 51 Pa. St. 475, it was held:

"A stipulation in a railway contract that the work was to be done in accordance with the plans, specifications, and instructions furnished by the company did not take the case out of the rule."

In *Reedie* v. *Railway Co.*, 4 Exch. 244, 258, it was held that:

"The power to watch the general progress of the work and to dismiss incompetent workmen will not make him responsible for the negligence of the contractor."

And in *Schular* v. *Railroad Co.*, 38 Barb. ( N. Y. ) 653:

" Nor will he be responsible where he retains the general superintendence of the work, where the contractor engages to discharge any servant at his request, and where he reserves the right to terminate the contract."

And in *Steel* v. *Railway Co.*, 16 C. B. 550:

"Nor even where he reserves the power, by his engineer, to direct generally what shall be done, if the injury springs from the manner of doing it."

Mr. Thompson says of building contracts and of an extreme case, § 662 ( *i. e.*, *Schwartz* v. *Gilmore*, 45 Ill. 455 [ 92 Am. Dec. 227 ] ):

"Application of this Doctrine to Building Contracts where Control is Reserved to Architects' and Superintendents. One court has gone so far as to hold that where a proprietor contracts for the erection of a building, and, by the terms of the contract, retains control by an architect, under whose direction the contractor agrees to do the work, and also retains the power to change the plan of the work, he will be answerable for the negligence of the contractor. This, however, is not the sound view of the usual building contract. The contractor stipulates to deliver to the proprietor certain results. He is responsible to the proprietor for these only. The proprietor does not retain control over the contractor as to his methods of proceeding with the work. He could not do so; for the contractor is generally skilled in the business, and he is not. No contractor could safely stipulate to do a job at a

fixed price, and then allow the proprietor to control him in matters of method and detail; for this might destroy his power so to order the work as to make his contract a profitable one.    The proprietor usually retains control by a skilled architect, not for the purpose of controlling the contractor in his methods, but for the purpose of assuring himself that the results enumerated in the specifications of the contract are reached by the contractor step by step as the work progresses.    There is no sound view under which such a contract can be construed as creating the relation of master and servant between the proprietor and contractor, and the conclusion of the Illinois court cannot be upheld, and the great weight of authority is to the contrary."

The learned author cites many cases in support of the last quotation.

Again, several of the following excerpts taken from a valuable note to the case of *Central Coal, etc., Co.* v. *Grider*, 65 L. R. A. 475, bear on this question:

"To every agreement by which one person undertakes to produce certain concrete results for the benefit of another, there is manifestly attached an implied condition that the latter person shall have the right of refusing to accept the results finally obtained, if they do not constitute a satisfactory execution of the agreement.    As a matter of ultimate analysis, this conception may be regarded as the basis of the well-settled doctrine that the independence of a contract is not destroyed by the inclusion of provisions which, although they entitle the employer to exercise a certain measure of control, go no further than to enable him to secure the proper performance of the work.

"'Was there a control or direction of the person in opposition to a mere right to object to the quality or description of the work done?    Where this element of personal control is found, then responsibility, either for malfeasance or nonfeasance, for fault or negligence, will attach, not only to the servant or workman (he is always liable), but to him who had the personal control over him, who was his superior in the sense of the maxim (*i. e., respondeat superior*).    On the other hand, if an employer has no such personal control, but has merely the right to reject work that is ill done, or to stop work that is not being rightly done, but has no power over the person or time of the workman or artisan employed, then he will not be their superior in the sense of the maxim, and not an-

swerable for their fault or negligence.' *Stephen* v. *Police Commissioners* (1876), 3 Sc. Sess. Cas. 4th series, 542.

" This statement of principles was quoted with approval in *Saunders* v. *City of Toronto* (1899), 26 Ont. App. Rep. 265.

" If the other provisions of the contract are such as render the person employed an independent contractor, he will not be converted into a servant by the insertion of stipulations reserving to the employer ' the right to change, inspect, and supervise to the extent necessary, to produce the result intended by the contract.' *Uppington* v. *City of New York* (1901), 165 N. Y. 222 (59 N. E. 91, 53 L. R. A. 550).

" In other words, the relation of master and servant is not inferable from the reservation of powers which do not ' deprive the contractor of his right to do the work according to his own initiative, so long as he does it in accordance with his contract.' * * *

" In a Canadian case, Osler, J. A., expressed the opinion that the legal criterion for determining the question whether the relation of master and servant existed was whether the alleged master had the power of controlling the work which the alleged servant was doing for him ' in respect to anything not necessarily involved in the proper doing of the work.' *Saunders* v. *City of Toronto* (1899), 26 Ont. App. Rep. 265. * * *

" In *Norwalk Gaslight Co.* v. *Borough of Norwalk* (1893), 63 Conn. 495 (28 Atl. 32), a contract for the construction of a sewer provided that the defendant borough was authorized by its engineer or such other person or persons, or in such other manner as it may deem proper, to inspect the materials to be furnished and the work to be done under the agreement, and to see that the same corresponded with the specifications. In the specifications were the following provisions: That the work should be backed in carefully, rammed and packed in and around the sewer with proper tools, by trusty persons ' approved by the engineer,' and no tunneling will be allowed ' except by written permission of the engineer;' that if, in excavating for any sewer or branch thereof, any water pipe, gas pipe, or other obstruction to be met with that ' in the judgment of the engineer should be avoided,' then the party of the second part (the contractors), after the same should have been measured by the engineer, should immediately fill such excavation; that the work should be prosecuted

at and from as many different points in such part or parts of the avenues or streets on the line of the work as the engineer might from time to time during the progress of the work determine; that plank foundations should be laid when necessary in the opinion of the engineer; that all work to complete drainage should be done according to the plans, etc., and, in accordance with all the directions of the engineer of said sewer committee;' that in cases of rock blasting the blast was to be carefully covered with heavy timber, according to the ordinances of the court of burgesses relative to rock blasting, which shall be strictly observed; that certain rock should be excavated with as little blasting as possible, and 'under the immediate supervision and direction of the engineer or his assistants;' that, if any person employed by the contractor on the work should appear to the engineer to be incompetent or disorderly, he was to be discharged immediately on the requisition of the engineer, and such person was not to be again employed upon them without permission of the engineer; that, if any materials or implements should be brought to the ground which the engineer might deem to be of improper description or improper to be used in the work, the same should be removed forthwith.

"Discussing the effect of this contract, the court said:

"'These provisions and others of similar import in the contract and specifications, certainly denote that a high degree of power to be exercised in the supervision of the work and to insure its performance by the contractor, was reserved by the defendant borough to its agents acting in its behalf; and, when coupled as it is with other provisions providing for the responsibility of the contractor "for all damages which may happen to neighboring properties, or in any way from neglect, and that he shall at his own expense, "shore up, protect, restore, and make good, as may be necessary, all buildings, walls, fences, or other properties which may be disturbed or injured during the progress of the work," fairly indicate that an intention existed on the part of the borough to reserve such control as in the judgment of its advisers was inconsistent with such immunity from liability as is now claimed in its behalf. But, on the whole, we are inclined to think that the weight of authority upon this question justifies us in holding that the reservations of control, being but partial, and existing in certain respects only, did not prevent the existence of the relation of contractee and independent contractor; that the general control over the work, as to the manner and method of its execution, the oversight and direction of the performance of the actual manual labor, especially in

the particulars in the execution of which the plaintiff claimed that the injury to its property was caused, notwithstanding the prescribed limitations, remained in the contractor; that the persons doing the work were his servants, not those of the defendant; and that these considerations relating to general control constitute the true test by which to determine whether the relation be that of employer and contractor or that of master and servant.'

"* * * In *Uppington* v. *City of New York* (1901), 165 N. Y. 222 (59 N. E. 91, 53 L. R. A. 550), another contract for the construction of a sewer provided that

" ' The city enginer was to "have the right to regulate the excavation," and not "more than 400 feet of trench" was to be opened at one time without his permission; while the commissioner of city works was authorized to "change at his discretion the amount of all the various kinds of work and materials and structures." The contractors were required to observe all the ordinances of the common council in relation to obstructing the streets, and "in all cases of rock blasting the blast" was "to be carefully covered with heavy timber, according to the ordinances of the common council" relating to the subject, "which ordinances shall be strictly observed." If any person employed by the contractor should "appear to the engineer to be incompetent or disorderly," he was to be discharged, and not employed again without permission. The engineer, with the consent of the commissioner, had power "to vary, extend, or diminish the quantity of work during its progress without vitiating the contract." It was also provided that "all explanations and directions necessary to the carrying out and completing satisfactorily the different descriptions of work contemplated and provided for under this contract will be given by said engineer." The city had the right to inspect the work and materials to see that they corresponded with the specifications. Any materials or implements brought upon the ground which the engineer "should deem to be of improper description or improper to be used in the work" were to be removed forthwith. The contractors were to have charge of, and be responsible for. the entire line of work until its completion and acceptance, and were not to be paid for any part thereof until the whole sewer was finished. The specifications contained many provisions relating to details of the work that are usually found in municipal contracts for the building of sewers.'

" It was held that there was nothing in the terms of the contract that required the conclusion that the contractor was a servant. * * * Of a similar contract the court said, in the case of *Rogers* v. *Railroad Co.*, 31 S. C. 378 (9 S. E. 1059):

"'They are nothing more than certain rules under which the work was to be done by Hardin, and intended to guarantee the faithful execution of the specified work. We do not see why one working under specified rules may not be an independent contractor, as without such rules. One contracting to build a house according to specifications and plans drawn by an architect, and under the inspection of the architect, which is usually the case, would, none the less, be an independent contractor, because of the presence and inspection of the architect. The point is, Who is doing the work? Is the company doing it by its employés, or is the contractor by his? The company certainly had the right to see that the contractor was doing the work according to the contract, and that he employed skillful and proper laborers, and the regulations above were, as it appears to us, intended to accomplish this end—nothing more.'

"* * * Likewise, a provision that the employer shall have the right of superintending and supervising by its agents execution of work under a contract, and of giving directions in relation thereto, does not render it less independent. *Weber* v. *Railway Co.* (1897), 20 App. Div. 292 (47 N. Y. Supp. 7).

"The same has been held with regard to a provision that the employer's agent is to 'superintend the work, and give such instructions from time to time during the progress as the necessities of the work shall demand.' *Robinson* v. *Webb* (1875), 11 Bush [Ky.], 464. And also with regard to a provision that the employer's engineer may declare the contract forfeited 'for noncompliance with his directions in regard to the manner of constructing' the railway in question. *Thomas* v. *Railway Co.* (1899), 191 Pa. St. 361 (43 Atl. 215). The trial judge, in an opinion adopted as correct by the supreme court, said:

"'Noncompliance with the directions of the engineer must be construed in connection with other parts of the contract. It evidently means noncompliance with his directions in such matters as under the agreement he had the right to direct. It does not either expressly or by inference give him the right to interfere with the means Stark (an independent contractor) chose to use to accomplish the work. Such right is not reserved in the agreement, and it was not within the contemplation of the parties that the engineer could compel a forfeiture of the agreement by assuming at his will to give directions in matters over which the agreement did not give him jurisdiction.'

"And likewise with regard to a provision that the work is to conform to such further direction as shall be given by the employer's agents. *Pack* v. *City of New York* (1853), 8 N. Y. 222. In which case the court said:

" 'This clause * * * is nothing more than a stipulation for a change of the specification of the work as stated in the contract at fixed prices provided therein. It does not, as the court below held, make Riley (a subcontractor) the immediate servant of the defendants, or give to them any control over him as to the manner or otherwise in which he should conduct the blasting. The defendants may change the grade by new specifications from that provided in the contract, and the duty is then imposed upon Foster to make his grade accordingly; but, as to the manner in which he shall proceed in his blasting to make the grade, or do the work, he is as perfectly independent of the defendants as a man ever was while engaged in doing his own work.'

"And the same holding has been given with regard to a provision that the materials and work are to be furnished and done 'according to the plan and under the direction and supervision' of the agent appointed by the owner (*Allen* v. *Willard* [1868], 57 Pa. St. 374; that the work shall be done 'as described in the specifications and agreeably to the direction from time to time' of the employer's agent (*Hughes* v. *Railway Co.* [1883], 39 Ohio St. 461). The court said that, when the whole contract was considered, it was quite clear that 'the directions of the engineer or his assistants' thus referred to were those only which were specially named in the specifications.

"And a like holding has been given with regard to a provision that the work is to be done 'in accordance with the plans and specifications and instructions furnished' by the employer 'or such persons as he may appoint.' *Hunt* v. *Railroad Co.* [1866], 51 Pa. 475. The court held that the word 'instructions,' used in the agreement, referred to the kind of structure, design, materials, combinations, and all matters pertaining to the planning of the building to be erected, but that as to the mode of accomplishing the work which the contractor undertook he was left to his own skill and judgment.

"And the holding has been the same with regard to a provision that the engineer in charge is to have power to prescribe the order in which the materials are to be placed and that the work is to be done and materials furnished as directed by him. *Callan* v. *Bull* [1896], 113 Cal. 593 (45 Pac. 1017).

"The independent nature of the contract has also been sustained where it contained a provision that the employer is to have the right of fixing the points to or from which the materials or articles handled by the contractor shall be conveyed, or the points at which such materials or articles are to be placed."

See, also, 3 Cur. Law, p. 1704; 11 Cur. Law, p. 1896; *Houghton* v. *Lumber Co.*, 152 Cal. 500 (93 Pac. 82, 14 L. R. A. [N. S.] 913, 14 Am. & Eng. Ann. Cas. 1159); 16 Am. & Eng. Enc. Law (2d Ed.), p. 186 *et seq.; Piette* v. *Brewing Co.*, 91 Mich. 605 ( 52 N. W. 152 ); *Riedel* v. *Moran, Fitzsimons Co.*, 103 Mich. 262 ( 61 N. W. 509); *Wright* v. *Manufacturing Co.*, 124 Mich. 92 ( 82 N. W. 829, 50 L. R. A. 495 ); *Lenderink* v. *Village of Rockford*, 135 Mich. 531 ( 98 N. W. 4 ); *Burns* v. *Paint Co.*, 152 Mich. 613 (116 N. W. 182, 16 L. R. A. [N. S. ] 816 ).

Reliance is placed by counsel for the plaintiff upon a provision of the contract requiring approval of subcontractors. It would seem that this is fully covered by the principle sustained by many of the foregoing cases, some of which are closely analogous or directly in point. We may say in passing that the recognized necessity for and right of subletting to subcontractors is hardly consistent with the claim that the relation was merely that of master and servant. The same may be said of the reservation of the right of the consulting engineer to direct the time and manner and speed of prosecuting the work; the object expressed being to secure the completion of the work on time. The provision relating to tools and unused material is consistent with either theory. These would be useful in the conduct of the telephone business, and it was competent for the parties to agree that they should be transferred to the Telephone Company.

The case of *Samuelson* v. *Mining Co.*, 49 Mich. 164 (13 N. W. 499, 43 Am. Rep. 456), is illuminating and to us conclusive on this subject. It was like the present case, an action for negligently causing the death of a

workman in a mine, and an important question was whether the defendant or a firm known as Selwood and Williams were liable. The latter worked the mine under a written contract. Among other provisions were the following:

"The quality of such ore shall be satisfactory to the superintendent (for the time being) of said second party, and shall be delivered in shipping cars on the railroad track at the mine during the shipping season, and at such other times as said second party may designate, and shall also be dumped into carts and sleighs, or stock piled at the option of said superintendent of said second party. Such mine shall be worked in a careful, prudent, and good workmanlike manner, to the entire satisfaction of said superintendent; and, in case it is not so worked and is left in a bad condition at the termination of this contract, then said second party shall have the right and is hereby authorized to put the said mine in the condition it should and would be if so worked in a good workmanlike manner, at the expense of said first parties, and retain the costs thereof out of any moneys in its hands belonging to said first parties; and whereas, iron mining in Marquette county, including said mine, is essentially a dangerous business, where accidents and injuries to the miners and their employés are likely to occur at any time, it is therefore hereby agreed that the relationship hereby created between the parties hereto is that of contractor and contractee, and not that of master and servant.

"It is the duty of the said first parties to be on the watch for danger at all times, either from slides, falls of rock, derangement of the skips, or of the machinery, and any and all other causes of danger in the mine. And in case said first parties regard any place as dangerous, they shall not be compelled to carry on any mining at such place. It shall be their duty to take down all rock or ore making any place where they are working dangerous, and when they find any dangerous ground, it shall be their duty instantly to report such dangerous place to said superintendent to the end that he may supervise the removal of the dangerous rock, or take such other steps to make such place safe; that is to say, as safe as a mine can be expected to be, as there can be no absolute safety in an iron or other underground mine. The parties of the first part, in consideration of the letting to them this contract,

and for the price to be paid them for the ore mined, hereby agree to assume for themselves and their employés all risks of danger or accident, no matter from what cause the same may arise, and all precautions taken against the danger of accident in said mine shall be done by said first parties, the said second party only furnishing the place to mine—the making of it safe hereby devolving on said first parties under the supervision, advice, and direction of said superintendent, for which no charge will be made by said second party.   *   *   *   Nothing herein shall be construed as creating any liability on the part of said second party, for any debts, damages, or other liability incurred by said first parties hereunder; and in case said second party is made liable for any act, omission, misfeasance or negligence of said first parties, or any or either of them, in the working of said mine, then said first parties shall reimburse and save harmless said second party, and said second party may retain enough of said earnings of said first parties in its hands to pay any such liability."

It was claimed that Selwood and Williams were independent contractors, and defendant not liable.   In answer the plaintiff insisted:

"That this duty of supervision and care at all times rested upon the mining company and was not devolved upon the contractors by the agreement made with them. This is the point on which the plaintiff chiefly relies."

Mr. Justice COOLEY said:

"Mere ownership of the mine can certainly impose no such duty.   The owner may rent a mine, resigning all charge and control over it, and at the same time put off all responsibility for what may occur in it afterwards.   If he transfers no nuisance with it, and provides for nothing by his lease which will expose others to danger, he will from that time have no more concern with the consequences to others than any third person.   If, instead of leasing, he puts contractors in possession, the result must be the same if there is nothing in the contract which is calculated to bring about danger.   *   *   *   But we do not find that in this case there was any such retention of charge and control, or that the arrangement between the contractors and the mining company gave to workmen any assurance that the company would protect them

against the negligence of the contractors and their servants. The terms of the contract are very full and specific in their negation of any such assurance, for the contractors expressly assume all risks themselves; and any workman made aware of the terms of the contract would understand that the mining company had taken special precautions to relieve itself of the duty upon a supposed breach of which this action is based. If, notwithstanding the contract, the duty of protection still rests upon the mining company, it is because no stipulation in the contract, however carefully worded, could prevent it. * * * But in the case of leasing this mine, there was nothing to preclude the contractors assuming the complete control if they saw fit to do so. The question is whether they have done so in fact. Upon this no controversy could arise were it not for the provision in the contract that the making the mine safe should be under the supervision, advice and direction of defendant's superintendent. This the plaintiff claims is conclusive. If this clause could have no office except to retain control in the hands of the mining company while professedly repudiating it, and would be otherwise idle and meaningless, the argument which is made for the plaintiff upon it would appear unanswerable. But other reasons are both apparent and cogent. Aside from any consideration of humanity, which might incline any one in delivering over to another a dangerous property to stipulate for some personal oversight, the mining company had abundant reason in its own interest. Negligent management might not only expose lives to peril, but might ruin the mine itself. Daily vigilance was important to preclude such a disaster, and the owner who had been working and was familiar with it would understand the weak points better and know better what was required to protect them than any persons new to the mine. The owner would also be more interested than another in being wary and vigilant. There is ample reason in these facts for demanding and insisting upon some right of supervision. But the supervision does not make the owner principal in the mine, or master in the working of it. The owner assumes towards no one the duty to supervise. He does not stipulate to supervise. He only contracts for a privilege. If the mineowner in this case had dismissed the superintendent and sent no one to inspect the working, no miner could complain that a duty owing to him was

being neglected.    The company had not promised to protect him, or to indemnify him for injuries; on the contrary, it had expressly stipulated that it should assume no such responsibility.    The privilege of intervention for its own protection was reserved; but the neglect of one's own interest is no wrong to others.    Legal wrongs must spring from neglect of legal duties.    *Reedie* v. *Railway Co.*, 4 Exch. 244, is in point here."

Again the contract provides:

"It is understood between the parties hereto, that wherever it appears in this contract or in the said plans and specifications that work and labor is to be done and performed, or material, apparatus or property is to be furnished for the construction and completion of said telephone plant and system, the same shall be done, performed, and furnished by said Construction Company, the said Telephone Company not being required to provide or furnish any building, material, apparatus, tools, instruments, labor, or money or anything hereunder, anything in the plans and specifications to the contrary notwithstanding.

"It is also understood that, inasmuch as the place and location of all work, buildings, material, and apparatus provided for in said plans and specifications is not fully set forth therein or in this contract, all of said work, material, and apparatus shall be performed, done, located, and placed at such places and in such manner as shall be designated or required by the consulting engineer or one of his assistants."

It is said that the last paragraph of this quotation should be held to conclusively show the liability of the Telephone Company, and that under it the Construction Company had no option as to how or where it would pile the telephone poles, that it was required to place them at such places and to place them in such manner as the consulting engineer should designate or require, and that the place and manner of piling were entirely under the control of the Telephone Company, and that it leased the yard where they were actually piled.    We have undertaken to show that the relation of master and servant does not presumptively follow from these various provisions taken separately or collectively, and that, if it could be said to

do so, they would still have to be considered, together with all other provisions which tend to show the contrary, and that this is a question for the court, inasmuch as all the provisions are within the four corners of a valid bona fide written contract between parties qualified and competent to contract, and we think we have succeeded in doing so.

Let us then examine this last provision, and consider its potency in overcoming any and all other provisions of the contract. We understand the claim to be substantially this: That this provision gives the right to the Telephone Company to dictate the place and manner of piling material and consequently of these poles. We construe that provision of the contract to mean this, and nothing more, viz., that owing to the incompleteness of the plans and specifications, and the contract as to the location of the plant and the system with its wires and poles, those things could not be fixed when the contract was made, and consequently the parties agreed that the work on the buildings and system, the materials for use in the completed plant (or for that matter the uncompleted plant), and the apparatus to be installed, should be done, located, and placed at such places and manner as should thereafter be designated. Is it not reasonable to say that this was understood to mean "the work contracted for shall be done and performed, and the buildings located, the materials and apparatus placed and set up at such places and in such manner—i. e., relative to each other—as the consulting engineer should designate and direct?" Is it not a far-fetched construction and an infinitesimal circumstance upon which to make such important and otherwise plain questions of legal construction turn? The further suggestion that these poles were piled upon lands said to have been leased by the Telephone Company bears on the question, is without force, if I am right in the proposition that the relation of these parties depends on the contract, and not on where these poles were piled. My understanding of the undisputed testimony in that regard, however, is that the Construction Company needed a place to pile

these poles.    It leased this ground for the purpose, and as it was and is obvious that a telephone company would need poles and a place to keep them as long as it should use poles in its business, the Construction Company, either with or without the approval, consent, or direction of the Telephone Company, leased in the Telephone Company's name.    It was used by the Construction Company and rent was paid by it until it finished the performance of its contract, when it turned over the possession with the rest of the plant to the Telephone Company.    I am impressed that this effort to hold the Telephone Company for the negligence of common workmen whom it never employed, paid, had the right to or did direct or control in any way, and in the face of a valid bona fide contract, which clearly indicates an understanding by both parties that it let out the construction to an independent contractor, has little of substance to stand upon, or in support of the claim that it is jointly liable with another, who, so far as the evidence in this case goes, can hardly be said to be liable at all if it was a servant of the Home Telephone Company.    Much has been said to show which of the two defendants is liable; very little to show how under the evidence both can be.

We should not overlook the fact in this case that with all the reserved right of supervision, dignified by counsel by the term "right of control," the contract does not give that absolute right of control which deprives the Construction Company of its right to produce a finished result by its own methods, means, and employés.    No right of controlling its employés in what they do is reserved. Only the right of requiring reasonable compliance with the agreement, as to time, place, material, workmanship, etc., is found here, and no means of enforcing even that is provided except such as the law gives to enforce the performance of any contract.    The contract gives to the consulting engineer large powers of complaint, approval,

164 MICH.—21.

directions, etc. The Construction Company promises therein to heed, obtain, and comply. That is all. No interference or right to discharge the Construction Company as its servant is given. On the other hand, it is evident that the contract contemplated the purchase of material by the Construction Company where and of whom it should choose, subject only to the approval as to character and quality. The same was true of employés who must necessarily have been obtained to perform this vast work, subject to the right to question qualification, fidelity, etc. The chief (not the consulting) engineer had full powers of control and directions as to excavation, construction, equipment, etc., subject to certain reserved right of approval, location, etc., confided to the consulting engineer. The Construction Company owned the material and the property until the contract was completed, subject to possible liens or security provided for. The work of securing franchises, permits, and subscribers was its own work, and nothing indicates any understanding that it was doing these things in a representative capacity. Indeed, the plain meaning of the agreement is wholly inconsistent with the relation of master and servant.

We must hold, therefore, that the learned circuit judge should have said to the jury that the Electric Construction Company was an independent contractor.

(b) Did the Home Telephone Company Participate in the Negligent Act ? There is no evidence that it did. The poles were unloaded by the employés of the Construction Company, without any direction or intervention of the consulting engineer or his assistants, upon land furnished for the purpose, leased to the Telephone Company for its own use later, the rent being payable by the Construction Company during the period of the construction of the plant. The judge erred in submitting these questions to the jury. He should have instructed them to render a verdict of not guilty as to the Telephone Company.

4. The Electric Construction Company. We have

already said that the question of negligence was for the jury; also the question of contributory negligence. It remains to inquire if there are any errors calling for a reversal of the judgment rendered against this defendant. The questions relating to the liability of the Telephone Company need no discussion (1) because we have held that it was not liable under the testimony; (2) because the testimony offered to prove its liability in no way injured the other defendant. Moreover, that testimony was in the main admissible under plaintiff's theory, and is only disregarded for the reason that, taken as a whole, it did not tend to establish the claim made for it.

Counsel for the defendant asked the submission to the jury of the following special question:

"Was the accident which resulted in Simon Larsen's injury and death on September 1, 1906, caused by a telephone pole rolling from a pile in the Harper avenue pole yard beside the mill track switch of the Grand Trunk Railway ?"

To which the court added: "Which pile had been negligently piled." The jury answered the question submitted, "Yes." The answer is inclusive of the question as submitted, and is conclusive of it. Counsel say that there was no proof to support this answer, but we have already determined that there was.

We are of the opinion that a new trial should not be granted upon the ground that defendants were not prepared to contradict and impeach the witness Barry with the affidavit that they had taken the precaution to procure at the time of the accident.

No error was committed in declining to admit the deposition of Desperit because it was taken in a case discontinued soon after and before the deposition was filed. Not only was it a different suit, brought by different counsel, but one of these defendants was not a party to it. We are cited to no authority that made the deposition admissible.

Plaintiff's counsel asked a witness, "Do you know

what his (deceased's) habits were as to industry and efficiency as a conductor?" to which defendants' counsel objected. The objection was overruled, and counsel took an exception. Inasmuch as the question was not answered, there is no occasion to discuss the question raised.

Counsel for the defendants was allowed to prove and introduce in evidence an affidavit made by Mrs. Larsen, the plaintiff, tending to show a delicate condition of health, and to follow it by a cross-examination of Mrs. Larsen upon the subject. The tendency of this was to indicate a short expectancy of life. Thereupon counsel for the plaintiff called her physician, who testified that her health had been seriously impaired by her trouble, and that she was very nervous from suspense in relation to this litigation, but that at the time of the trial she was much improved, and that in his opinion her life might not be shortened much by her trouble. The court permitted this testimony, as bearing upon the subject of her expectancy; the defendants' counsel having introduced it. This was proper.

The accident occurred September 1, 1906. The verdict was taken on or about July 20, 1909. It was in terms for $9,000 damages and $1,312.50 interest, for which sums judgment was rendered. It may be said that a more accurate computation would be to estimate the damages suffered to the date of the verdict, and add to it the present value of prospective damage, but the difference would be small. The damage supposed to have been recovered was the then present value of the contribution that deceased would have, as of the date of the judgment, made to the widow and children had he lived. They were entitled to that sum when he died, and where the present value was fixed as of that date, as it would seem that it was in this instance, we see no reason for omitting interest to the date of the judgment. *Snow* v. *Nowlin*, 43 Mich. 383 (5 N. W. 443); *Cook* v. *Perry*, 43 Mich. 623 (5 N. W. 1054); *Lucas* v. *Wattles*, 49 Mich. 380 (13 N. W. 782); *Kendrick* v. *Towle*, 60 Mich. 363 (27 N. W. 567, 1 Am. St. Rep. 526); *Coan* v. *Township of Browns-*

*town*, 126 Mich. 626 (86 N. W. 130); 13 Cyc. p. 88; 15 Cent. Dig. §§ 137–140; 12 Cur. Law, p. 319; *Collins* v. *Coal Co.*, 140 Iowa, 114 (115 N. W. 497, 118 N. W. 36, 18 L. R. A. [N. S.] 736). We have endeavored to deal with such questions as may arise again, and have thought it unnecessary to discuss others.

The judgment is affirmed as to the Electric Construction Company, and reversed and a new trial ordered as to the Home Telephone Company.

BLAIR, J. I am unable to concur in that portion of the opinion of Mr. Justice HOOKER in which it is held that the circuit judge "should have said to the jury that the Electric Construction Company was an independent contractor." It appears to me that the question was at least one for the jury, and in my opinion the construction contract warranted an instruction that the Construction Company was not an independent contractor. The contract does not merely give to the Telephone Company a general supervision of the work with authority to enforce compliance with the provisions of the contract as the work proceeded, but it gives to such company a control over details which is inconsistent with the rights of an independent contractor. I quote some of the provisions of the contract which have led me to this conclusion:

"* * * That any and all material, appliances, tools, utensils, instruments, appurtenances, and other property and effects of whatsoever kind and description, which may enter into or become part of said telephone plant and system, shall be approved by said consulting engineer before the same shall be used by the said Construction Company in the construction of said plant and system. Said Construction Company does hereby expressly agree that it will abide by and accept the decision and opinion of said consulting engineer as to the kind and quality of material and the installation of the same, and the construction of said plant, and all other matters hereinbefore referred to, and said Construction Company does further agree that it will not use, in the construction of said telephone plant and system, material, or other matters herein referred to which

shall not have been approved by said consulting engineer, nor will it (said Construction Company) perform any work in connection with said telephone plant and system in a manner which shall not be approved of by such consulting engineer. * * * The term 'consulting engineer,' whenever used in this agreement or in the plans and specifications which are herein referred to as part of this contract, shall be construed to mean the engineer from time to time selected by the Telephone Company (or by the person nominated by said Telephone Company) to supervise the carrying out of the provisions of this agreement. * * * All directions, explanations, superintendence, and instructions spoken of or required under this contract will be given by the consulting engineer or such assistant or inspectors as shall be by him or by said Telephone Company or its nominees designated. * * * The consulting engineer shall have the right to make any change in extent, dimensions, plans, or character of any part of the work and materials, either before or after the beginning of the work under this contract. * * * As soon as this contract is signed by the Telephone Company, the Construction Company shall, as soon as possible and without delay, furnish for the approval of the consulting engineer a complete list of the subcontractors it proposes to employ in and about the performance of this contract, and no subcontractor other than the subcontractors approved of by the consulting engineer shall be allowed to do any part of the work called for by this contract, but the Telephone Company reserves the right to substitute another contractor or subcontractor in place of any contractor or subcontractor, who shall, in the judgment of the consulting engineer, be incompetent, or unreliable, or shall fail to fully comply with all and singular, every provision expressed and called for under the plans and specifications, and involved in the contract of such subcontractors. * * * The work shall be commenced withen ten (10) days after the signing of this contract by the parties hereto, and shall be prosecuted at such time and in such manner as the consulting engineer may direct, with such force as shall at all times cause the work to proceed in such manner and at such speed as shall be satisfactory to the consulting engineer, so that the whole work and said plant and system shall be finished and delivered to said Telephone Company on or before the date herein provided. * * * All tools or appliances purchased for use by the

Construction Company in the construction of the telephone plant and system under this contract, shall, upon completion of this contract, be and become the absolute property of the Telephone Company, and all the materials owned by the Construction Company for the purpose of carrying out this contract, and in connection therewith, or which shall remain unused by said Construction Company, shall be and remain the property of the Telephone Company. * * * It is also understood that inasmuch as the place and location of all work, buildings, material, and apparatus provided for in said plans and specifications is not fully set forth therein or in this contract, all of said work, material, and apparatus shall be performed, done, located and placed at such places and in such manner as shall be designated or required by the consulting engineer or one of his assistants."

Under these provisions the Construction Company had no voice in determining what tools, materials, etc., it would use in fulfillment of its contract, but, "before the same shall be used," must submit the same to the consulting engineer. It could not select its own agents and employés, but must submit a list to the consulting engineer for his selection, and, after they were employed, the consulting engineer could discharge them without its consent and appoint others in their places. The time and manner of prosecuting the work were to be determined by the consulting engineer and the force to be employed. The tools and materials approved of by the consulting engineer in the first place and on hand at the finish were to be the property of the Telephone Company. And finally "all of said work, material and apparatus shall be performed, done, located and placed at such places and in such manner as shall be designated or required by the consulting engineer or one of his assistants." This last provision appears to me to conclusively dispose of the question so far as the instant case is concerned. Under this provision, the Construction Company had no option as to where or how it would pile the telephone poles. It was required to place them "at such places," and to place them "in such manner" as the consulting engineer should designate

or require. The place and manner of piling were entirely under the control of the Telephone Company, and it leased the yard where they were actually piled. It is difficult to comprehend how a business corporation composed of competent and experienced business men could have been induced to enter into a contract of the nature of the one in question for the ordinary reasons operating upon men seeking their own profit.

I concur in holding that the questions of negligence and contributory negligence were for the jury. I also agree that there was no prejudicial error committed in the rulings of the court as to the admission or rejection of testimony or in the allowance of interest. In my opinion the circuit court did not commit any reversible error.

The judgment is affirmed.

OSTRANDER, C. J., and BIRD, MOORE, McALVAY, BROOKE, and STONE, JJ., concurred with BLAIR, J.